COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-07-186-CV

 

 

IN THE INTEREST OF M.Y., A CHILD

                                                                                                        

 

                                              ------------

 

           FROM
THE 323RD DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM
OPINION[1]

 

                                              ------------

Introduction

Appellants Mario Y. (Father)
and Pamela Y. (Mother) appeal the trial court=s order terminating their parental rights to their child, M.Y.  In two issues, Father argues that the
evidence is legally and factually insufficient to support the trial court=s best interest finding.  In
three issues, Mother argues that the evidence is factually insufficient to
support the trial court=s
endangerment and best interest findings. 
We affirm.








 

Background Facts

Appellants married in 2002
and had a child, M.Y., on November 28, 2002. 
M.Y. tested positive for cocaine at birth.  Father testified that he did not know Mother
was using drugs at the time of M.Y.=s birth although he was aware that Mother was a recovering heroin
addict.  The Texas Department of Family
and Protective Services (TDFPS) became involved, and appellants agreed to place
M.Y. with another family.[2]  TDFPS wanted appellants to get drug
treatment.  Appellants, however, hired an
attorney who advised them that they should go pick up M.Y.  Appellants followed their attorney=s advice and retrieved M.Y. 
TDFPS closed the case.[3]








In the spring of 2003, TDFPS
again became involved with the family after it received a report that M.Y. was
not being properly supervised.  Father
testified that Mother had postpartum depression and was diagnosed as bipolar
although the bipolar diagnosis was later dropped.  Mother testified that she was not depressed
or bipolar but that she had had a car accident, which prompted her to take pain
medication.  TDFPS closed the case.[4]

In the spring of 2004, TDFPS
received another referral regarding M.Y.[5]
Mother testified that she had been taking a lot of medications at that time and
that she later admitted to Father that she was abusing her medications.  TDFPS investigated, and the case was closed.[6]

Mother testified that she
began using methamphetamines again in 2005. 
She admitted that she self-medicated while on Lithium, Zyprexa, and
Xanax.  Mother also admitted that she
introduced Father to methamphetamines. 
Father and Mother testified that they had used illegal drugs together
after M.Y.=s birth, but
when they used illegal drugs, they left M.Y. with a babysitter.

In May 2005, TDFPS received
another referral that M.Y. was unsupervised and eating dog food.  Mother admitted to TDFPS that she was having
problems with her medication.  TDFPS investigated,
and the case was closed.[7]  Between May 2004 and August 2005, law
enforcement arrested Mother four times for the offense of possession of a
controlled substance.








In November 2005, when M.Y.
was three years old, a fire broke out in appellants= home because the electric meter had been illegally Ajumped.@ Appellants
and M.Y. were in the house when the fire started, but they escaped. The fire
department and law enforcement responded to the emergency.  After the police  arrived, they arrested Mother on outstanding
warrants for probation violations and drug possession charges and took her to
jail.  Father asked their neighbor,
Rebecca Jones, to watch M.Y. so that he could bail Mother out of jail.  Father called his mother-in-law=s boyfriend and asked him to pick up M.Y. At some point before Father
returned, however, Jones left M.Y. unattended, and TDFPS was called and took
possession of M.Y.  Father testified that
his mother-in-law tried to pick up M.Y., but TDFPS would not release him to
her.  When Father returned to his neighbor=s house to get M.Y., TDFPS told him that M.Y. had been removed because
Father had abandoned him.

Father admitted that he told
TDFPS investigators that he was not using drugs, even though he had been
using.  Mother was released from jail a
couple of weeks after the arrest.  While
incarcerated, Mother met with a TDFPS investigator and admitted that she and
Father were addicted to methamphetamines. 
Mother agreed to check into Springwood, a psychiatric facility, but
after her release, she sought counseling services from Dr. Ronald Elkins, a
counselor she had previously seen, instead.








TDFPS placed M.Y. with his
maternal grandmother, Pamela C., from November 2005 until March 2006.  Melissa Gordon, a TDFPS caseworker, received
appellants= case in
March 2006 while M.Y. lived with Pamela and appellants worked towards
reunification.  However, at some point in
March 2006, Pamela refused to take a drug test, and she told TDFPS to come and
get M.Y.  Mother testified that she was
aware that her mother had a history of alcohol and drug abuse, but she believed
that Pamela was doing well when she named her mother as a placement for M.Y.  TDFPS then sought removal of M.Y. from his
grandmother=s home, and
the trial court placed him in foster care.








Zeke Sanchez from TDFPS gave
appellants a family service plan that included parenting classes, counseling,
and drug treatment.  Father and Mother
chose to use their own service provider, Dr. Elkins.  In March 2006, Father gave Sanchez papers
from Dr. Elkins stating that Father had completed his service plan
requirements; however, TDFPS discovered at a pretrial hearing that Dr. Elkins
was a convicted felon and that he and Father had done drugs together.  TDFPS also discovered that Father had sold
drugs to Dr. Elkins.  In March 2006,
Father and Mother stopped seeing Dr. Elkins. 
Mother testified that she had no knowledge that Dr. Elkins and her
husband had done drugs together.  After
Dr. Elkins=s drug use
with Father was discovered, TDFPS established a new service plan with TDFPS
service providers that required a psychological evaluation, a substance abuse
assessment, counseling, parenting classes, and random drug tests.

In April 2006, police came to
appellants= home and
found methamphetamines.  They arrested
Father, but he was not prosecuted. 
Mother testified about another arrest of Father that also happened in
the spring of 2006.  Mother stated that
she and Father visited her aunt at her aunt=s school. Officers searched them and found a knife and drugs on
Father.  They then arrested him.

Mother testified that she
quit using methamphetamines in April 2006. 
In July 2006, Mother=s probation was revoked for failure to report, and she went back to
jail.  At the time of the termination
trial in April 2007, Mother was incarcerated but expected to be released in
July 2007.  Since M.Y.=s birth, Mother had been in jail on thirteen occasions.








After TDFPS placed M.Y. in
foster care, Father began counseling with Norma Bartholomew.  Bartholomew testified that she was led to
believe Father=s drug
activity related more to selling drugs than using drugs.  During this time, Father submitted to
urinalysis and hair follicle tests.  On
July 28 and August 4, 2006, Father tested negative on two urinalysis
tests.  But on August 18, 2006, Father
tested positive for marijuana on a urinalysis test.  On October 31, 2006, Father tested positive
for methamphetamines on a hair follicle test at a level that indicated he was a
constant user, although the test provided for a ninety-day window.  Father denied that he was currently using
drugs and told Gordon that the positive test result pointed to earlier drug
use.  But Father admitted at trial that
he was still using methamphetamines in October 2006.  Father reported to TDFPS that he was working
towards making M.Y. his sole priority, and Father=s caseworker and therapist supported his efforts.  As a result, TDFPS extended Father=s visitation with M.Y.  From
December 2006 until February 2007, Father had unsupervised weekend visits with
M.Y.  Although alleged, Father denied
that M.Y. rode unrestrained in his vehicle during those visits.  Father also took M.Y. to visit Mother in
jail.  Father testified that he was not
aware that he could not take M.Y. to visit Mother.  TDFPS then told him not to take M.Y. to visit
Mother in jail, and Father complied. 
Additionally, Father always returned M.Y. after his weekend visitations
and was only late once because of bad weather and a flat tire.








In February 2007, Father
again tested positive for methamphetamines after a hair follicle test, and
TDFPS stopped Father=s extended
visitation.  Father then entered
rehab.  He testified at trial that he had
stopped using drugs.  Father also
testified that, at the time of trial, he had a full-time job and also had his
own business on the side.  Father also
stated that he had bought a home in November 2006.  CASA Advocate Rebecca Trimble and Gordon both
testified that Father=s home was
nice and an appropriate living environment for M.Y. Father said that he always
visited M.Y. and saw him as often as possible. Father also finished his
parenting classes.  Mother testified that
Father had taken care of M.Y. when she was incarcerated and had been a
protective parent.  Mother stated that
she would relinquish her parental rights if Father could keep M.Y.

Gordon left the employment of
TDFPS in February 2006.  She testified
that Father never acknowledged methamphetamine use, but he did admit to
marijuana use in August 2006.  Gordon
also stated that she did not believe appellants could provide an emotionally
and physically safe environment for M.Y. because of their drug use.

Jeremy Ingram, another
caseworker for TDFPS, received appellants= case from Gordon in March 2007. 
He testified that the status of appellants= case when he received it was that the permanency plan had changed
from reunification to possible placement with relatives.  If no possible relative placement was
available, TDFPS planned to terminate appellants= parental rights.








Appellants provided several
potential placements for M.Y.  They
identified M.Y.=s godparents
and Mother=s aunt,
Carmen Stevens, as potential placements, but both the godparents and Stevens
refused.  Stevens did not feel like her
work situation allowed her to adequately care for a child.  Stevens, who owned a house next to Father=s new house, testified at trial that she had observed a lot of people
coming in and out of the residence.  She
also testified that strange cars stayed all night.  Stevens stated that she visited Father while
he had people in the house and that she saw pornography playing on every TV in
the house.  Stevens stated that the
activity she observed did not occur on the weekends when M.Y. was present.  M.Y. had his own room at Father=s house, but Stevens testified that the room was sometimes occupied by
other people when M.Y. was not there. 
Stevens testified that Father loves M.Y., but Father=s choice of friends was not appropriate for a child.  Stevens watched M.Y. while Father went to
visit Mother in jail.  She testified that
she heard Father say that if he got M.Y., he would take the child to Mexico,
but he was joking around.








Appellants also identified
M.Y.=s aunt, Mariella Gutierrez, as a possible placement option for
M.Y.  At the time of trial, Gutierrez
lived in San Antonio and taught fifth grade. 
TDFPS caseworker Sanchez initially contacted her as a possible placement
for M.Y., and she testified that she was willing to have M.Y. placed with her
if appellants were unable to care for him. 
Later, Gordon called Gutierrez about conducting a home study because
appellants were still having difficulties. 
Gutierrez stated that she had five other people living in her house C her husband, two sons, and her sons= girlfriends.  The home study
required all of the family members to be available for a two-to-three hour
visit, and Gutierrez said it took her a while to get a time slot available with
everyone present.  The caseworker met
with Gutierrez and her family in September, but the interview ended after the
caseworker asked if the family would be able to call the police if Father
showed up to see M.Y.  One of Gutierrez=s sons and Gutierrez=s husband said they could not call the police if Father came by their
house and M.Y. was living with them. 
Ingram stated that TDFPS was concerned with Gutierrez=s unwillingness to call law enforcement on Father if necessary.  Ingram also said that other family members in
the household would not be able to prevent Father from seeing M.Y.  Gutierrez testified that if the order
prohibited visitation by Father, she would have complied for the safety of
M.Y., but she felt like the question asking her if she would call the police if
Father attempted to visit M.Y. was not clear.








Gutierrez stated that her
family did not have a criminal history except for  her husband. 
When he was twenty-eight, her husband took nunchucks to a bar, not
knowing that they were illegal.  Her
husband was now forty-three and never had any other arrests.  Gutierrez thought Father was doing well and
therefore she did not attempt to follow-up after the interview in September.
When Gutierrez found out that appellants were still having problems, she called
Ingram to check on the situation.  She
testified that her family would have done whatever was necessary to keep M.Y.
and even suggested her sister Mary Philips as a placement option.  Gutierrez also stated that she was confident
that Philips would have had a successful home study because she did not have
any children and was looking forward to having M.Y.

In March 2007, Ingram
initiated a home study on M.Y.=s aunt, Mary Philips, in Corpus Christi.  Philips had managed an apartment complex;
however, she had given up that position in early January 2007 to be available
to take M.Y.  She stated that she was
aware of TDFPS= involvement
at M.Y.=s birth, but she first heard that Father could lose custody of M.Y.
when Gutierrez called her.  Philips faxed
a letter of intent to Sanchez and Gordon on January 16, 2007, stating that she
wanted to be considered for placement. 
Two weeks later, Sanchez called Philips and interviewed her over the
phone.  On March 20, 2007, TDFPS sent a
woman to interview Philips and her husband in their home. The subsequent home
study report showed that there was a large amount of dog feces caked into the
carpet and dead insects in the house. 
Additionally, the report indicated that there were registered sex
offenders living in the area.








Philips testified about the
condition of her apartment and admitted that, at that time, it was a Atotal disaster@ because the
carpet was being replaced. She stated that her carpet was rolled up and ready
to be removed because it had been damaged by a leaking water heater.  Philips also said that pest control had
sprayed earlier that day.  Philips told
the investigator about the circumstances surrounding the condition of her
home.  Philips also testified that two
registered sex offenders lived in her apartment complex, and one of them was
her next-door neighbor.  Philips said she
volunteered the information to Sanchez before the home study began, and Sanchez
told her it was not a problem.  She also
said that she would move if she needed to in order to get M.Y.  Ingram testified that there were some
cleanliness concerns regarding Philips=s home.








Philips testified that she
would follow whatever the court ordered concerning Father=s ability to see M.Y. because her main concern was M.Y.  She stated that she had no problem calling
the police if Father came by and he was not supposed to see M.Y.  Philips said neither she nor her husband had
any criminal history.  They had been
married for twenty-four years.  They did
not have any children, but Philips testified that she has several nieces and
nephews that spend a lot of time with her and her husband.  Philips also stated that she knew that Father
struggled with drugs, but they kept separate lives so she did not know any
details.  Philips testified that she made
it clear to Sanchez that she and her husband were willing to do whatever they
needed to make sure their nephew did not get placed in foster care, including
moving and giving up her four dogs. 
Philips did receive information that if she got M.Y., Father would come
get him and leave the state.  Philips
testified that she confronted Father about it, and he denied ever saying that.

Rebecca Trimble, the CASA
Advocate assigned to M.Y., also testified at the termination hearing.  Trimble had been involved in M.Y.=s case since November 2005. 
Trimble attended several visitation sessions with appellants and M.Y. at
the TDFPS office and also visited with them at their home.  Trimble observed Mother visit M.Y. at a time
when Mother had a staph infection. Trimble testified that Mother said she
should not be around people and that Mother was more concerned about her latest
condition than interacting with M.Y.  She
stated that Father never appeared intoxicated during visits, but Mother
sometimes had slurred speech, bloodshot eyes, or trouble focusing. Trimble also
testified that she believed appellants put their emotional needs ahead of M.Y.=s emotional needs, and because of their extended drug use, she
recommended their parental rights be terminated.













The foster father, D.P.,
testified at the termination hearing. 
M.Y. came to live with D.P.=s family on May 25, 2006.  D.P.
and his wife have two daughters.  D.P.
testified that his daughters and M.Y. were extremely bonded, like brother and
sisters.  M.Y. has his own room at the
foster family=s house as
well as clothes and toys.  D.P. testified
that M.Y. was Afairly
delayed@ developmentally when he first came to live with them.  For example, D.P. testified that M.Y., at
three-and-a-half years old, only knew one color, yellow, and he identified
every color as yellow.  M.Y. could say Aone, two, three@ and AA, B, C@ but had no
concept of what the numbers or letters meant or what they looked like.  D.P. also testified that M.Y. was diagnosed
with reactive attachment disorder, which meant that M.Y. formed bonds with
other people too easily.  D.P. testified
that M.Y. was never taught the stranger-danger concept, and if an adult showed
him any attention or affection, M.Y. would walk off with that person.  D.P. testified that it was hard to take M.Y.
to a store because he had to hold M.Y.=s hand the entire time or he would wander off.  D.P. also testified that he had taken M.Y. to
a play therapist.  The therapist gave the
foster family things to work on with M.Y., such as the stranger-danger
concept.  In addition, D.P. testified
that when M.Y. first came to their house, he would eat incessantly.  D.P. stated that there were several times
where M.Y. ate until his stomach was distended and he would vomit. D.P. also
stated that M.Y. was enrolled in a classroom-style preschool and that he was
doing very well.  D.P. testified that
over the past year, M.Y. had learned the concept of numbers, had learned his
letters, and had learned the sounds that they make.  D.P. also said that M.Y. can now write his
name and point out other words that have an AM@ like
McDonalds.  D.P.=s oldest daughter helped M.Y. with his homework.  M.Y. also turned food away and did not gorge
himself anymore.

D.P. also testified that on
one occasion when Father was returning M.Y. to D.P., M.Y. was upset, and D.P.
overhead Father tell M.Y. not to worry, that it would all be over soon, and
M.Y. would be coming home with Father or go to Aunt Mary=s, so either way they would be together all the time.  D.P. also testified that a few times when
Father returned M.Y., he noticed M.Y. standing next to Father in the van and
not in a car seat.  D.P. also stated that
sometimes M.Y. would be cranky after visiting Father because he did not get
enough rest, and he would hit and rough-house more.  D.P. also said that M.Y. always cried when
leaving Father, and D.P. could not deny that M.Y. and Father had a bond. D.P.
testified that he and his wife would like to adopt M.Y.

On May 30, 2007, after the
final termination hearing, the trial court terminated appellants= parental rights to their son, M.Y., by determining that appellants
(1) knowingly placed or knowingly allowed M.Y. to remain in conditions which
endangered his physical and emotional well-being and (2) engaged in conduct or
knowingly placed M.Y. with persons who engaged in conduct which endangered his
physical or emotional well-being and that (3) termination was in M.Y.=s best interest.  The trial
court also appointed TDFPS as permanent managing conservator.  Appellants timely filed this appeal.








Statement of Points

As a preliminary matter, we
address the State=s contention
that appellants= issues in
their statements of points and motions for new trial are too vague and lack
specificity.  Section 263.405(i) of the
Texas Family Code provides,

The
appellate court may not consider any issue that was not specifically presented
to the trial court in a timely filed statement of the points on which the party
intends to appeal or in a statement combined with a motion for new trial.  For purposes of this subsection, a claim that
a judicial decision is contrary to the evidence or that the evidence is
factually or legally insufficient is not sufficiently specific to preserve an
issue for appeal.[8]

The relevant portions of
Father=s combined motion for new trial and statement of points allege that
the evidence is legally and factually insufficient to support the trial court=s findings that (1) he knowingly placed or knowingly allowed M.Y. to
remain in conditions or surroundings which endangered M.Y.=s physical or emotional well-being, (2) he engaged in conduct or
knowingly placed M.Y. with persons engaged in conduct which endangered his
physical or emotional well-being, and (3) termination of the parent-child
relationship was in M.Y.=s best
interest.








The relevant portions of
Mother=s combined motion for new trial and statement of points allege that
the evidence is factually insufficient to support the trial court=s findings that (1) she knowingly placed or knowingly allowed M.Y. to
remain in conditions or surroundings which endangered M.Y.=s physical or emotional well-being, (2) she engaged in conduct or
knowingly placed M.Y. with persons engaged in conduct which endangered his
physical or emotional well-being, and (3) termination of the parent-child
relationship was in M.Y.=s best
interest.

Here, Father=s and Mother=s statements
of points identify the trial court=s findings, outline the elements of those findings, and raise legal
and factual insufficiency claims.  Both
appellants= statements
of points were specific enough to allow the trial court to correct any
erroneous findings on the challenged grounds. 
In re J.W.H., 222 S.W.3d 661, 662 (Tex. App.CWaco 2007, no pet.); In re A.J.H., 205 S.W.3d 79, 80 (Tex. App.CFort Worth 2006, no pet.).  We
therefore address Mother=s three
factual sufficiency challenges to the endangerment findings under subsections
(D) and (E) and best interest finding and Father=s legal and factual sufficiency challenges to the best interest
finding.[9]








Standard of Review

A parent=s rights to Athe
companionship, care, custody, and management@ of his or her children are constitutional interests Afar more precious than any property right.@  Santosky v. Kramer, 455
U.S. 745, 758-59, 102 S. Ct. 1388, 1397 (1982); In re M.S., 115 S.W.3d
534, 547 (Tex. 2003).  AWhile parental rights are of constitutional magnitude, they are not
absolute.  Just as it is imperative for
courts to recognize the constitutional underpinnings of the parent-child
relationship, it is also essential that emotional and physical interests of the
child not be sacrificed merely to preserve that right.@  In re C.H., 89 S.W.3d
17, 26 (Tex. 2002).  In a termination
case, the State seeks not just to limit parental rights but to end them
permanentlyCto divest
the parent and child of all legal rights, privileges, duties, and powers
normally existing between them, except for the child=s right to inherit.  Tex. Fam. Code Ann. ' 161.206(b) (Vernon Supp. 2007); Holick v. Smith, 685 S.W.2d
18, 20 (Tex. 1985).  We strictly
scrutinize termination proceedings and strictly construe involuntary
termination statutes in favor of the parent. 
Holick, 685 S.W.2d at 20-21; In re E.M.N., 221 S.W.3d 815,
820 (Tex. App.CFort Worth
2007, no pet.).








In proceedings to terminate
the parent‑child relationship brought under section 161.001 of the family
code, the petitioner must establish one ground listed under subdivision (1) of
the statute and must also prove that termination is in the best interest of the
child.  Tex.
Fam. Code Ann. ' 161.001
(Vernon Supp. 2007); In re J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established;
termination may not be based solely on the best interest of the child as
determined by the trier of fact.  Tex.
Dep=t of Human
Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex.
1987).

Termination of parental
rights is a drastic remedy and is of such weight and gravity that due process
requires the petitioner to justify termination by clear and convincing
evidence.  Tex. Fam. Code Ann. '' 161.001, 161.206(a); In re J.F.C., 96 S.W.3d 256, 263 (Tex.
2002).  This intermediate standard falls
between the preponderance standard of ordinary civil proceedings and the
reasonable doubt standard of criminal proceedings.  In re G.M., 596 S.W.2d 846, 847 (Tex.
1980); In re C.S., 208 S.W.3d 77, 83 (Tex. App.CFort Worth 2006, pet. denied). 
It is defined as the Ameasure or degree of proof that will produce in the mind of the trier
of fact a firm belief or conviction as to the truth of the allegations sought
to be established.@  Tex.
Fam. Code Ann. ' 101.007
(Vernon 2002).

 








Legal sufficiency

In reviewing the evidence for
legal sufficiency in parental termination cases, we must determine whether the
evidence is such that a fact-finder could reasonably form a firm belief or conviction
that the grounds for termination were proven. 
In re J.P.B., 180 S.W.3d 570, 573 (Tex. 2005).  We must review all the evidence in the light
most favorable to the finding and judgment. 
Id.  This means that we
must assume that the fact-finder resolved any disputed facts in favor of its
finding if a reasonable fact-finder could have done so.  Id. 
We must also disregard all evidence that a reasonable fact-finder could
have disbelieved.  Id.  We must consider, however, undisputed
evidence even if it is contrary to the finding. 
Id.  That is, we must
consider evidence favorable to termination if a reasonable fact-finder could,
and disregard contrary evidence unless a reasonable fact-finder could not.  Id.

We must therefore consider
all of the evidence, not just that which favors the verdict.  Id.  But we cannot weigh witness credibility issues
that depend on the appearance and demeanor of the witnesses, for that is the
fact-finder=s
province.  Id. at 573, 574.  And even when credibility issues appear in
the appellate record, we must defer to the fact-finder=s determinations as long as they are not unreasonable.  Id. at 573.

 








Factual sufficiency

In reviewing the evidence for
factual sufficiency, we must give due deference to the fact-finder=s findings and not supplant the judgment with our own.  In re H.R.M., 209 S.W.3d 105, 108
(Tex. 2006).  We must determine whether,
on the entire record, a fact-finder could reasonably form a firm conviction or
belief that the parent violated subsection (D) or (E) of section 161.001(1) and
that the termination of the parent=s parental rights would be in the best interest of the child.  C.H., 89 S.W.3d at 28.

Endangerment Findings

In Mother=s first and second issues, she argues that the evidence is factually
insufficient to support the trial court=s determination that she (1) knowingly placed or knowingly allowed
M.Y. to remain in conditions or surroundings that endangered his physical or
emotional well-being and (2) engaged in conduct or knowingly placed M.Y. with
persons who engaged in conduct that endangered his physical or emotional
well-being.








Endangerment means to expose
to loss or injury, to jeopardize.  Boyd,
727 S.W.2d at 533; In re J.T.G., 121 S.W.3d 117, 125 (Tex. App.CFort Worth 2003, no pet.). 
Under subsection (D) of family code section 161.001(1), we must examine
the evidence related to the environment of the child to determine if the
environment was the source of the endangerment to the child=s physical or emotional well-being. 
J.T.G., 121 S.W.3d at 125; In re D.T., 34 S.W.3d 625, 632
(Tex. App.CFort Worth
2000, pet. denied).  Conduct of a parent
in the home can create an environment that endangers the physical or emotional
well-being of a child.  J.T.G.,
121 S.W.3d at 125; In re W.S., 899 S.W.2d 772, 776 (Tex. App.CFort Worth 1995, no writ).  For
example, parental and caregiver illegal drug use and drug-related criminal
activity support the conclusion that the child=s surroundings endanger his physical or emotional well-being.  J.T.G., 121 S.W.3d at 125.

Under subsection (E), we must
determine whether evidence exists that the endangerment of the child=s physical well-being was the direct result of the parent=s conduct, including acts, omissions, or failures to act.  Id. 
Additionally, termination under section 161.001(1)(E) must be based
on more than a single act or omission; a voluntary, deliberate, and conscious
course of conduct by the parent is required. 
Tex. Fam. Code Ann. ' 161.001(1)(E); D.T., 34 S.W.3d at 634.  However, it is not necessary that the parent=s conduct be directed at the child or that the child actually suffer
injury.  Boyd, 727 S.W.2d at 533; J.T.G.,
121 S.W.3d at 125.








To determine whether
termination is necessary under subsection (E), courts look to parental conduct
before and after the child=s birth.  J.T.G., 121
S.W.3d at 125;  In re D.M., 58
S.W.3d 801, 812 (Tex. App.CFort Worth 2001, no pet.).  A
mother=s drug use during pregnancy may amount to conduct that endangers the
physical and emotional well-being of the child. 
J.T.G., 121 S.W.3d at 125; In re K.M.B., 91 S.W.3d 18, 25
(Tex. App.CFort Worth
2002, no pet.).  Additionally, drug
addiction and its effect on a parent=s life and ability to parent may establish an endangering course of
conduct as well.  J.T.G., 121
S.W.3d at 125.

Imprisonment alone does not
constitute endangering conduct, but it is a factor that the trial court can
consider on the issue of endangerment.  Boyd,
727 S.W.2d at 533-34; D.M., 58 S.W.3d at 812.  The State, however, does not need to show
that incarceration was a result of a course of conduct that endangered
the child; it only needs to show incarceration was a part of a course of
conduct that endangered the child.  Id.  Thus, if the evidence, including
imprisonment, proves a course of conduct that has the effect of endangering the
child, the requirement of subsection (E) is met.  Boyd, 727 S.W.2d at 533-34; D.M.,
58 S.W.3d at 812.

Analysis








The evidence shows that
Mother continuously abused drugs, even during her pregnancy, and that M.Y
tested positive for cocaine at birth. 
Mother also admitted to abusing her medications after M.Y.=s birth.  Father testified that
Mother was diagnosed with postpartum depression, chronic pain syndrome, and
panic disorders.  Mother stated that she
was in a car accident, which necessitated her taking numerous medications, and
she began to abuse her medications. 
Mother also testified that she began using methamphetamines in
2005.  Mother admitted that she
introduced Father to methamphetamines and that they would send M.Y. to a
babysitter so that they could do drugs together. Between May 2004 and August
2005, police arrested Mother four times for the offense of possession of a
controlled substance.  After the house
fire in November 2005, Mother admitted to TDFPS that she and Father were
heavily addicted to methamphetamines and that she needed treatment because she
could not care for M.Y.  Mother, however,
did not check herself into a hospital or drug rehab facility, but did visit her
doctor.

While M.Y. was in foster
care, Mother sometimes cooperated with TDFPS and sometimes did not.  TDFPS caseworker Melissa Gordon testified
that Mother was difficult to reach at times. 
On May 4, 2006, Mother submitted to a hair follicle test, and she tested
positive for methamphetamines.  The test
indicated high usage on a daily basis. 
Mother also testified that she was doing drugs at the time of her
substance abuse assessment in June 2006.








From M.Y.=s birth until the time of trial, Mother had been in jail a total of
thirteen times on drug related offenses and probation violations.  While incarcerated, Mother participated in
CATS drug treatment, parenting classes, and Life Skills classes.  Mother testified that she had not used drugs
since she had been in jail.  At the time
of trial, Mother was incarcerated and expected to be released in July 2007.

The evidence shows that
Mother=s continuously used drugs before and after M.Y.=s birth and that M.Y. was born with drugs in his system.  Furthermore, she had been in jail on numerous
occasions because of her drug abuse, and at the time of trial, was
incarcerated.  Mother=s continuous abuse of both prescription and illegal drugs threatened
M.Y.=s physical and emotional well-being because her actions prevented M.Y.
from being supervised properly and exposed M.Y. to an unhealthy
environment.  At the time of M.Y.=s removal, he was developmentally delayed, suffered from reactive
attachment disorder, and was not well fed. 
But see In re D.J.J., 178 S.W.3d 424, 429-30 (Tex. App.CFort Worth 2005, no pet.) (holding evidence insufficient to prove
endangerment because there was no evidence that parent=s drug use created a dangerous environment).








Viewing the evidence in a
neutral light, we hold that the evidence is factually sufficient to support the
trial court=s findings
that Mother (1) knowingly placed or knowingly allowed M.Y. to remain in
conditions or surroundings that endangered his physical or emotional well-being
and (2) engaged in conduct or knowingly placed M.Y. with persons who engaged in
conduct that endangered his physical or emotional well-being.  Tex.
Fam. Code Ann. '
161.001(1)(D), (E).  We overrule Mother=s first and second issues.

Best Interest Findings

In her third issue, Mother
argues that the evidence is factually insufficient to show that termination of
the parent-child relationship was in M.Y.=s best interest.  In his first
and second issues, Father argues that the evidence is legally and factually
insufficient to show that termination of the parent-child relationship was in
M.Y.=s best interest.

Applicable law

Prompt and permanent
placement of the child in a safe environment is presumed to be in the child's
best interest.  Tex. Fam. Code Ann. ' 263.307(a) (Vernon 2002). 
There is also a strong presumption that keeping a child with a parent is
in the child=s best
interest.  In re R.R., 209 S.W.3d
112, 116 (Tex. 2006).  Nonexclusive
factors that the trier of fact in a termination case may use in determining the
best interest of the child include:

(1)    the desires of the child;

(2)    the emotional and physical needs of the child now and in the
future;

 

(3)    the emotional and physical danger to the child now and in the
future;

 

(4)    the parental abilities of
the individuals seeking custody; 








(5)    the programs available to assist these individuals to promote the
best interest of the child;

 

(6)    the plans for the child by these individuals or by the agency
seeking custody;

 

(7)    the stability of the home
or proposed placement;

(8)    the acts or omissions of the parent which may indicate that the
existing parent‑child relationship is not a proper one; and

 

(9)    any excuse for the acts or
omissions of the parent.

Holley v. Adams, 544 S.W.2d 367, 371B72 (Tex. 1976).

These factors are not
exhaustive; some listed factors may be inapplicable to some cases; other
factors not on the list may also be considered when appropriate.  C.H., 89 S.W.3d at 27.  Furthermore, undisputed evidence of just one
factor may be sufficient in a particular case to support a finding that
termination is in the best interest of the child.  Id. 
On the other hand, the presence of scant evidence relevant to each
factor will not support such a finding.  Id.

Evidence of appellants= relationship with M.Y. - the
desires of the child








There is no evidence of M.Y.=s desires regarding placement or termination.  At the time of the termination hearing, M.Y.
was five years old and had been in foster care since he was four years
old.  Before living with D.P. and his
family, M.Y. lived with his maternal grandmother.  The record indicates that he had little
contact with Mother, and there was no evidence that he had bonded with her.

The record shows that M.Y.
bonded with Father, and M.Y. would often cry when leaving Father to return to
the foster family.  The record indicates,
however, that M.Y. had also bonded with his foster family.

Evidence
of drug use and unstable lifestyle - the emotional and physical needs and
danger to M.Y. now and in the future

 

While appellants= history of drug use and conduct related to drug use support the trial
court=s endangerment findings, this evidence is also relevant to a best
interest determination.  See D.M.,
58 S.W.3d at 814.  The record shows that
appellants consistently used drugs before and after M.Y.=s birth and before and after his removal.  They also had a criminal history as a result
of their drug use, and at the time of trial, Mother remained incarcerated.  Appellants= substance abuse led to criminal activity and also prevented
appellants from supervising M.Y. properly. 
Additionally, M.Y. was developmentally behind, did not eat
appropriately, and suffered from reactive attachment disorder.  Appellants= drug use and criminal history support the trial court=s findings that termination of the parent-child relationship is in M.Y.=s best interest.

Evidence
of appellants=
efforts to comply with their service plan - parenting abilities of the
individuals seeking custody








The record shows that
appellants did not adequately complete their service plans.  Appellants continued to use drugs and
repeatedly lied about their drug usage. 
Mother had problems interacting with M.Y. in one visit and was
incarcerated for most of the time after M.Y.=s removal.  Although Father
visited M.Y., he lost visitation rights because of his drug use.  Additionally, the foster parent testified
that he saw M.Y. riding with Father without a car seat, and there is evidence
that Father=s home was
an unsuitable environment for a child. 
Thus, this evidence also supports the trial court=s determination that termination was in M.Y.=s best interest.

Programs available to assist the parents
to promote the best interest of M.Y.

The record shows that Mother
participated in programs such as CATS and parenting classes after she was in
jail, but there is no evidence that she participated in any programs available
before she was incarcerated.  Father also
completed parenting classes.  There is no
other evidence in the record regarding the programs available to assist
appellants.

Potential
placement of M.Y. - the plans for M.Y. by the parents or TDFPS
and the stability of the home or proposed placement

 








Appellants recommended
Gutierrez and Philips as placement options for M.Y.  After conducting home studies, TDFPS
concluded that neither aunt was a suitable placement option.  TDFPS claimed Gutierrez, M.Y.=s aunt from San Antonio, was not a suitable option because Gutierrez=s family was hesitant to call law enforcement if Father came by to see
M.Y. in violation of a court order. 
Gutierrez testified that if the order prohibited Father from visiting
M.Y., she would comply for the safety of M.Y., but she felt like the question
asking her if she would contact the police if Father attempted to visit M.Y.
was not clear.

TDFPS also found that
Philips, M.Y.=s aunt from
Corpus Christi, was not an adequate placement option because of concerns
regarding the cleanliness of her apartment and the presence of sex offenders in
her apartment complex.  The home study
report showed that there was a large amount of dog feces caked into the carpet
and dead insects in the house; however, Philips testified that her apartment
was a Atotal disaster@ because her
carpet was in the process of being replaced and because the pest control had
sprayed earlier in the day. From this testimony, the trial court, acting as the
trier of fact and arbiter of witness credibility, could have disbelieved
Gutierrez=s testimony
regarding her resolve to keep Father from seeing M.Y. and could have also
disbelieved Philips=s testimony
regarding the condition of her apartment. 
See In re A.C., 758 S.W.2d 390, 394 (Tex. App.CFort Worth 1988, no writ).








The foster family desired to
adopt M.Y.  The evidence reflects that
M.Y. has flourished with his foster family, bonding with D.P.=s daughters and overcoming developmental delays.  M.Y.=s reactive attachment disorder has improved, and he no longer grossly
overeats.  We hold that the evidence on
this factor also supports termination.

The
acts or omissions of the parents which may indicate that the existing
parent-child relationship is not a proper one - any excuse for the acts of
omissions of the parent

 

Evidence of a parent=s unstable lifestyle can support a factfinder=s conclusion that termination is in the child=s best interest.  S.B.,
207 S.W.3d at 887.  A parent=s drug use, inability to provide a stable home, and failure to comply
with a family service plan support a finding that termination is in the best
interest of the child.  Id. at 887-88.
 The evidence shows that at the
time of trial, Mother remained incarcerated due to drug use and Father was in
rehab and had been unable to maintain a drug-free lifestyle.

Viewing all the evidence in
the light most favorable to the judgment, we hold that the evidence is legally
sufficient to support the trial court=s finding that termination of Father=s parental rights was in M.Y.=s best interest.  See Tex. Fam. Code Ann. ' 161.001(2).  We overrule Father=s first issue.

Viewing the same evidence in
a neutral light, we hold that it is also factually sufficient to support the
trial court=s findings
that termination of appellants= parental rights was in M.Y.=s best interest.  See id.  We overrule Mother=s third issue and Father=s second issue.

 








Conclusion

Having overruled all of
appellants= issues, we
affirm the trial court=s judgment.

 

TERRIE LIVINGSTON

JUSTICE

 

PANEL F:    LIVINGSTON, HOLMAN,
and GARDNER, JJ.

DELIVERED: January 24, 2008











[1]See Tex. R. App. P. 47.4.





[2]The
record indicates that appellants voluntarily agreed to place M.Y. with his
godparents at TDFPS=s
request.  The record does not indicate
whether TDFPS filed a petition or received temporary custody.





[3]The
record does not indicate why TDFPS closed the case.





[4]The
record does not indicate why TDFPS closed the case.





[5]The
record does not indicate on what grounds the referral was based.





[6]The
record does not indicate why TDFPS closed the case.





[7]The
record does not indicate why TDFPS closed the case.





[8]Tex. Fam. Code Ann. '
263.405(i) (Vernon Supp. 2007); In re S.B. & Y.B., 207 S.W.3d 877,
881-82 (Tex. App.CFort
Worth 2006, no pet.); In re D.A.R., 201 S.W.3d 229, 230 (Tex. App.CFort
Worth 2006, no pet.) (analyzing this statute).





[9]Even
though Father raised sufficiency challenges to the trial court=s
endangerment findings in his combined motion for new trial and statement of
points, on appeal he challenges only the legal and factual sufficiency of the
evidence to support the trial court=s best interest finding.